Frank A. Gttlotta, J.
The plaintiff Albini and Ms wholly-owned corporation, Hallad Construction Corp., are united in interest and will be so treated throughout this opinion.
The action is one for a declaratory judgment in which the plaintiff seeks an adjudication that a Building Zone Ordinance of the defendant city under which he was given a building per *815 mit for an apartment house is valid, that the permit itself is likewise valid, and that he has a vested right to continue building thereunder.
Beside denials, the answer pleads as an affirmative defense, that plaintiff was warned by an order of this court on October 17, 1967, by Pittoni, J., that continued construction would be at his own risk.
It appears that in or about November, 1966, plaintiff became interested in a 4%-acre parcel of land at Pearsall Avenue and Glen Street, Glen Cove, known as the Titus property, as a site for a four-story apartment house. It was then being used as a lumber yard, although the City Council at the time was considering amending its ordinance so as to permit an apartment house use of the site in question. It was already under contract of sale to Ben David Pearl Corp., and on December 30, 1966, plaintiff agreed to purchase the contract from Ben David, the future assignment being contingent upon the change of zone being finalized.
On January 18, 1967, the City Council adopted new zoning requirements for apartment houses which, among many other changes, permitted construction to a height of four stories, and also adopted a notice of intention to amend the zoning map of the city and sent the latter to the Planning Board for its consideration and recommendations in accordance with section 24-21 of the Code of Ordinances.
On March 28, 1967, the Council adopted amendments to the zoning map, following the modifications recommended by the Planning Board. On the new map the Titus parcel is included in the R-5A, Central Apartment House Overlay District as a “G” parcel.
Before proceeding with the apartment house project it was necessary that Albini obtain site approval of the plot plan from the Planning Board and he continued with the architect who had been hired by Ben David for that purpose. Site approval was obtained on July 11, 1967, and building plans were then filed with the Building Department. These were processed for over a month and then approved on August 24, 1967, and a permit issued. The latter takes the form of stamping ‘ ‘ approved ” on a copy of the original plans which are then returned to the applicant.
Title to the land was conveyed August 31, 1967, the plaintiff paying $370,000 cash therefor. Plaintiff had been lining up subcontractors from March onward and after title closed he entered into contracts with them covering most of the work to be done, since he does none of it himself in his own organiza *816 tion. Ground was broken, the existing structures demolished and footings and foundations put in. A large amount of soil had to be moved first, since the site approval had required lowering the grade of the parcel some 12 feet.
In the meantime on August 26, 1967," and unknown to Albini, one Andrew J. Pilla and others commenced an action against the city and the then owner, Titus, attacking the validity of the amendments to the zoning ordinance. This information was withheld by the seller at the closing five days later and Albini did not learn of it until September 27,1967, when he was served with motion papers to add him to the Pilla case as a party defendant. He had already done a considerable amount of physical work on the property in addition to having obligated himself by contract to numerous subcontractors and suppliers. The proof shows that as of October 17, 1967, when Justice Pittoni’s decision referred to in defendants’ answer was rendered, plaintiff had made actual out-of-pocket payments of $579,804 which included the cost of the land, or about $200,000 if the lánd is excluded. Firm contract obligations by that time amounted to $1,531,751. Pictures of the project show the stage it had reached on October 17. These photographs show footings and foundations in various stages of installation and were estimated moneywise by witnesses at the trial to constitute 10% completion of Building A and 20% of Building B.
After Albini became a party to the Pilla action, his efforts were directed toward obtaining a prompt trial on the merits, whereas the plaintiff sought to delay it. When the case came on for trial before Justice Brennan on December 12, 1967, he refused to grant plaintiff any further adjournments and the parties thereupon entered into a stipulation in open court discontinuing the action as against Albini “with prejudice ” and an order was entered to that effect on December 14, 1967. The order also canceled the Us pendens.
A new administration took over in Glen Cove on January 1, 1968, and on February 26, 1968, plaintiff received a letter from the Building Inspector, sent at the direction of the Mayor, revoking his building permit for two reasons: (1) that the fees paid for it were insufficient; (2) that the plans violated the zoning ordinance in providing for “fire protected” construction instead of “fireproof” construction. Plaintiff promptly commenced the present action and made a motion for a temporary injunction restraining the defendant from interfering with his operation pendente lite, which came on for argument before Justice Suluvan on March 15, 1968. He denied the *817 motion on March 26, referring to a decision which had been made by Justice Albert in the Pilla case on March 5 and which held the ordinance amendment of January 18, 1967, “void and of no effect” principally because the resolution had never been voted upon by the City Council. Justice Sullivan pointed out that since this was a holding that the ordinance was void ab initio, the plaintiff had shown no clear legal right to relief and therefore could not obtain same in advance of a trial. He, of course, had no way of knowing that factually the basis for Justice Albert’s holding did not exist and that on June 18, 1968, he would amend his decision by eliminating that basis for it and relying only on the second ground, to wit: that there were substantial differences in the zoning amendment as enacted and the prior notice of public hearings advertised. Justice Albert did not amend the judgment itself and there was no one to urge him to do so, since at the same time he denied a motion by Albini to intervene, thus foreclosing any direct attack on the judgment by appeal or otherwise, by the only person interested in doing so.
On April 3, 1968, plaintiff was served with a criminal summons for building without a permit and construction has been halted since that time.
Turning first to the merits of the revocation: Plaintiff’s Exhibit No. 39 shows that plaintiff paid fees of $4,758 for the permit on the basis of estimated construction costs of $1,184,000. The city’s contention that this was inadequate is based on an affidavit which plaintiff’s attorneys filed in connection with this litigation showing that his entire investment would be substantially more than that sum. This, of course, included the land, architect’s fees, attorneys’ fees, overhead, interest, taxes, etc. which are not considered construction costs. Nothing was offered by the city on this trial to show what the actual cost of construction would be. Furthermore, the proof is and it is confirmed by the City Building Inspector, that at the time of procuring the permit Albini proffered and he, the Inspector, accepted a proposal that final determination of construction costs would be deferred until the building was completed and that he, Albini, would furnish satisfactory proof of the actual cost before a certificate of occupancy would issue and that the exact permit fee would then be fixed and paid.
As to the second ground, it is undisputed that the city duly adopted the State Construction Code on May 25, 1954, and has been operating under it for the past 14 years and has never withdrawn from it. Glen Cove appears in the list of muniei *818 palities following section 374-a of the Executive Law as one of the municipalities which adopted the code, and under the section itself there is no method provided to withdraw from it piecemeal. Furthermore, subdivision 1 of section 386 of the Executive Law states: “ Nothing in this article shall be construed as prohibiting any municipality from adopting or enacting any building regulations relating to any building within its limits, but no municipality in which the state building construction code has been accepted and is applicable shall have the power to supersede, void, or repeal or make more restrictive any of the provisions of this article or of the rules and regulations adopted by the council hereunder.” On July 26, 1966, the zoning ordinances of the city were codified and put in a single volume. The adopting ordinance for this codification section 2 states, that while contrary ordinances are repealed, no resolution not specifically mentioned is repealed. Since the adoption of the State code was by resolution rather than by ordinance, it follows that it is not deemed repealed by implication.
Section 5-1 of the new code again adopts the State Building Code for Glen Cove but purports to give the local building code precedence over the State code where there is a conflict, which under section 386 of the Executive Law it may not do.
There is no direct reference to the 1954 resolution other than in a parenthesis at the end of section 5-1, so it is debatable whether it was intended to alter the city’s adherence to the State Building Code in this indirect way. But even if we assume that it was, it is apparent from the provisions of the Executive Law quoted above, that it was ineffective to do so.
It is undisputed that the State 'Construction Code prescribes “fire protected'’'’ construction for a four-story building and not “ fireproof ” construction. It was for this reason that the Building Inspector told Albini that his building could be of fire-resistant construction.
The amendment to the zoning ordinances passed by the City Council on January 18, 1967, in addition to many other changes in apartment house regulations, at column 22 item 3, had called for fireproof construction, but on April 11, 1967, this requirement was repealed when it was called to the 'City Council’s attention by the Building Inspector that it was invalid because it was contrary to the State code.
Thus it is apparent from this analysis that neither of the reasons assigned by the city in the letter of revocation was a sufficient reason, or indeed any reason at all for the action it took.
*819 There remains for discussion the soundness of the city’s attack on the ordinance itself.
At the outset it may he well to point out that the trial before Justice Albert was a joust with a strawman, since the city was as anxious for the plaintiffs to succeed as the plaintiffs were themselves, but even so, it was rather a remarkable affair. The city started out by conceding that if a certain witness were called by the plaintiffs he would testify that putting an apartment house where the lumber yard had been would depreciate the value of the planitiffs ’ nearby private residences.
The City Attorney then stipulated not merely to what a witness might say, but to the legal conclusion that the differences between the notice and the ordinance were substantial thus stipulating the plaintiffs ’ entire case.
The City Clerk and the Secretary to the Planning Board were both called as witnesses in the Pilla case and testified as to what their official records showed. The records themselves were also produced in court. These records show the following series of events which will be somewhat condensed for the sake of brevity:
Plaintiffs’ Exhibit No. 1 — November 22, 1966, 'City Council adopted resolution of intention to amend the zoning ordinance re: apartment house districts and referred same to the City Planning Board for hearing and report.
Plaintiffs’ Exhibit No. 2- — Planning Board minutes of December 6, 1966, ordered a public hearing on the Council proposal to be held December 20, and publication of a notice thereof in the official newspaper of the City, the Glen Cove Record-Pilot.
Plaintiffs’ Exhibit No. 3 is a copy of the newspaper publication with an affidavit of publication.
Plaintiffs’ Exhibit No. 4 shows that an extensive public hearing was held before the Planning Board and in the last paragraph on page 7 it records that the hearing was adjourned to January 3, 1967, for the purpose of having the recommendations of Raymond and May, planning consultants, published along with a republication of the Council’s proposals.
Plaintiffs’ Exhibit No. 5 is a facsimile of the republication of the Council’s proposal and also the Planning Board’s proposal and shows that this was done on December 29, 1966.
The principal difference between the Raymond and May proposal which was adopted by the Planning Board as its own, and the City Council’s proposal, was the former called for apartment houses to be no more than six stories high or 65 feet and the latter four stories or 45 feet.
*820 At the Planning Board meeting held January 3, 1967, objection was made that no map had been published and the Chairman pointed out that no map change was being made at that time, and before any was made it would have to be passed by the Council and referred for a public hearing. The meeting was closed and a resolution passed which recommended that the Raymond and May proposal be adopted by the Council.
On January 18, 1967, the Council adopted a resolution of intention to amend the zoning map and referred it to the Planning Board. At the same time it passed the apartment house zoning amendment which had been returned by the Planning Board. The ordinance as passed, is a synthesis or fusion of the proposals of both the Council and the board, precisely following neither but adhering to the general purpose of both. Not only do these minutes show that the Council voted on the ordinance but they are actually signed by each member of the Council. More will be said on this subject later.
Both resolutions were published in the Record-Pilot on January 26, 1967 and this included the map.
The Planning Board ordered a public hearing on the map change for March 7, 1967, and notice of this was published March 2, but the map was stated to be available for inspection instead of being published again as the Planning Board had ordered. Accordingly the meeting of March 7 was adjourned to March 15 and the notice ordered republished together with the map.
Plaintiffs’ Exhibit No. 15 shows that this was done on March 9, 1967.
The public hearing was held and the Council’s recommendations approved with some exceptions, notably that family density be held to 16 apartments per acre instead of the 24 proposed by the ¡Council.
On March 28 the Council adopted the map change as modified by the Planning Board and this ordinance was duly published on April 6.
From this documentary proof it is clear beyond cavil, that these ordinance amendments were as thoroughly publicized at every .step of the way as any ordinance could possibly be and yet on the trial before Justice Albert, and with the proof to the contrary in the courtroom, we find the Planning Board Secretary testifying that there never was any notice published of the Planning Board proposed amendment and that there never was a public hearing.
*821 The published notice is pasted in the minute book she had with her, on page 33, following the minutes of the December 6, 1966, meeting.
We also find the City Clerk testifying that Exhibit “ C ” attached to the complaint in the Pilla case was an exact copy of the City Council minute book, although it showed no vote by the City Council whereas in fact the minute book shows the vote.
In extenuation of these women it may be said that they probably had no clear idea of the significance of what they were saying, especially the new City Clerk who had just taken office, but the same cannot be said for the City Attorney who had given this case top priority and worked on it assiduously as the first order of business. The record does not show that he had anything to say to the court in this regard to enlighten it on what the true facts were.
Veiled hints were dropped throughout this trial that proof would be adduced by the city showing that there had been some tampering by the former administration with the minutes of January 18,1967, since they are the only minutes actually signed by the members of the Council. The explanation for this turned out to be perfectly simple and straightforward. The former City Clerk testified that she had made an error in omitting the record of the vote in the proposed minutes which she had prepared although the resolution had, in fact, been voted on and passed. This is confirmed by the fact that as sent to the newspaper and published at the time, the vote was included. The then City Attorney advised her that the error could be cured by having corrected minutes signed by. each member of the Council and that was done. It was her impression that the corrected minutes were prepared by the City Attorney. Apparently it was one of the incomplete copies, which are customarily kept in the Clerk’s office as ditto copies for distribution to the public, which became Exhibit “ C ” in the Pilla complaint and at the time the complaint was prepared its inclusion may have been an innocent mistake. But the situation at the time of trial before Justice Albert was quite different.
From this summary of events, it is manifest that the city’s actions have been high-handed and arbitrary in the extreme and that its position is devoid of merit.
The question is — Is this court bound by the prior decisions in this and the Pilla case and must it deny the plaintiff any relief on this trial irrespective of the merits. As to Justice *822 Sullivan’s decision, it is elementary that the denial of a motion for a temporary injunction is not an adjudication on the merits of the plenary trial which is to follow. Here it is said to be otherwise, because of the reason he assigned for doing so. Since it was not necessary to the decision, the reason was dicta, but more important, as has been pointed out above, the basis for the dicta was eliminated after the decision was made.
The defendant contends that Justice Albert’s decision is res judicata for this case, but this ignores a fundamental tenet of that doctrine, to wit, that a decision is binding only on the parties to the case and their privies. The rule may be stated as follows: A final judgment on the merits by a court of competent jurisdiction is conclusive of the rights of parties or their privies in all later suits on points and matters determined in the former suit. To be applicable the doctrine requires identity of the thing sued for as well as identity of the cause of action, of persons and of parties to the action for or against whom claim is made. Albini is privy to no one in that case and he has been diametrically opposed to them throughout. Furthermore, the argument gives no weight to the effect of the discontinuance “ with prejudice ”. I have not been able to find much in the case law as to the legal effect of such a discontinuance. It seems to me that its minimum effect would be to preclude the same claim from being made against the same party again, yet that is exactly what the city is trying to do. The city would have us say that it is just as though Albini had remained in the case and had the judgment go against him. With reference to discontinuances CPLR 3217 (subd. [b]) says in part: “ By order of court. Except as provided in subdivision (a), an action shall not be discontinued by a party asserting a claim except upon order of the court and upon terms and conditions, as the court deems proper ’ ’ which gives the court a broad discretion even when acting on its own. Here there was the stipulation of the parties to support it as well. In Brown v. Bullock (32 Misc 2d 111) the court ordered that a voluntary discontinuance be “ with prejudice ” and indicated that it would have the effect of permanently preventing another suit.
In Van Aalten v. Mack (9 A D 2d 648), the court observed: “ Since the proceedings in this action had never developed intensively, discretion warrants the granting of permission to plaintiffs to voluntarily discontinue the action, albeit with prejudice to the particular plaintiffs. In a proper case, however, in which the proceedings were more extensively developed, the court not only has the power, but might well exercise it, to *823 require a further condition to voluntary discontinuance. Thus, in order to give harassed defendants, if that be the case, the effect of res judicata as to all stockholders, the court could require appropriate notice to be given to all stockholders with opportunity to intervene and carry on the prosecution of the action before granting the discontinuance to the particular plaintiffs. (See Rules of Civ. Prac., rule 301, subd. 2) ” (emphasis ours) thus indicating that the res judicata aspect of a discontinuance ‘ ‘ with prejudice ’ ’ works in favor of the party let out and not the other way around. Thus it is inaccurate to say that Albini lost his right to a trial on the merits because he permitted a discontinuance. Bather it appears that he insisted on it and that it be “with prejudice ” because of plaintiffs’ dalliance. He was in a position to do this because of the counterclaim which he had interposed. Ordinarily while a court can do no more than nonsuit a plaintiff who refuses to proceed, thus leaving the door open to another lawsuit, where there is a counterclaim, the court can proceed to try it on the merits and thus finally conclude the litigation where the complaint and counterclaim are mutually exclusive as they were here. (Greenberg v. De Hart, 4 N Y 2d 511.)
Nor do I see any basis for the contention that the doctrine of stare decisis applies to our situation. Simply stated that doctrine holds that when a court has once laid down a principle of law as applicable to a certain state of facts, it will adhere to that principle and apply it to all future cases where the facts are substantially the same. It is simply a doctrine that impels a court to adhere to precedent. Justice Albert’s decision pronounces no general principles of substantive law which are in dispute. Every one agrees that a 1 ‘ substantial ’ ’ difference between a prior public notice and an ordinance as adopted may invalidate it. The question is, what is a “ substantial ” difference? Justice Albert did not go into that, since in the absence of any argument or proof to the contrary and in view of the city’s concession it was unnecessary, and the cases cited in his opinion (Village of Mill Neck v. Nolan, 233 App. Div. 248, affd. 259 N. Y. 596) do no more than state the bare rule. However, it is necessary that this court go into this question now.
The record contains a comparison of the published City Council’s intention to amend, the published Planning Board’s proposal and the ordinance as finally passed. It is poorly reproduced but supplemented by the trial notes will suffice for our purpose. There are alleged to be 19 changes. This is not quite so, since to be a change it would have to differ from both *824 proposals. I find none which were not published either as a Council proposal, a Planning Board proposal or which are not more restrictive than one or the other or both, e.g.
PLANNING BOARD ORDINANCE
Item 3. COUNCIL PROPOSAL PROPOSAL AS PASSED
Maximum height 4 Stories or 45 ft. 4 Stories or 45 ft. but 4 Stories or 45 ft.
6 Stories or 65 ft.
if area over 4 acres
Item 5.
Minimum lot area Not less than 1 acre Not less than 1 acre Not less than 2 acres
and and and
1400 sq. ft. for 1 rm. 665 sq. ft. for 1 rm. 1000 sq. ft. for 1 rm.
apt. apt. apt.
1700 sq. ft. for 2 1200 sq. ft. for 2 1300 sq. ft. for 2
rm. apt. rm. apt. rm. apt.
2000 sq. ft. for 3 1600 sq. ft. for 3 1600 sq. ft. for 3
rm. or more rm. or more rm. or more
Item 6.
Minimum lot width 100 feet 100 feet 150 feet
Item 7.
Minimum frontage 100 feet 100 feet 150 feet
Item 9.
Minimum front yard 20 feet 25 feet 50 feet
Item 10.
Minimum rear yard 30 feet 30 feet 35 feet
This same pattern of increased requirements persists throughout the changes where there are any.
Where there is no corruption of a public official involved, or evidence of collusion between the permittee and the city officials, an amendment to the zoning laws and the permit issued under it should not be lightly set aside because of a discrepancy between the published notice and the amendments eventually adopted.
The public hearing procedure itself contemplates that there may be changes. Loosely using the term “ substantial” contributes nothing to a solution of the problem. Neither does adding up the sheer number of changes. The true test is whether the notice as published fairly apprised the average citizen reading it with the general purpose of what is contemplated, e.g. one could not advertise a change in zone from residential to commercial and then make it industrial, because that would be clearly misleading. However, where the change of use is clearly specified, details as to setbacks, side yards, etc. cannot be said to be “ substantial ” in the sense that people reading the notice would be misled and thus induced to stay away from the hearing and not present their views. Unless that is so, the notice has served its purpose.
*825 Justice Meyer in Brechner v. Incorporated Vil. of Lake Success (25 Misc 2d 920, 924-925) expresses somewhat the same idea in the following language and I am in accord therewith: “ Application of the rule of the Village of Mill Neck case turns on whether the revisions made in the ordinance after public hearing are substantial. There is no question that extensive changes were made in the ordinance. However, the changes made appear to have resulted largely from the public hearing and did not constitute a change in purpose or area such as was involved in Shefler v. City of Geneva (1 Misc 2d 807); Matter of Paliotto v. Cohalan (6 Misc 2d 1); and Callanan Road Improvement Co. v. Town of Newburgh (6 Misc 2d 1071, affd. 5 A D 2d 1003). Further the changes made were all adverse to the owner of the subject property except the changes of sections 5.0 and 7.0 which permitted the Planning Board to reduce either front yard depth or parking restrictions in order ‘ to accommodate more advantageous grouping of structures. ’ The latter 1 was not so substantial and extensive a change as to require a new public hearing, ’ (Matter of Halpern v. Dassler, 135 N. Y. S. 2d 8, 12). As for the former, while some doubt concerning the question is raised by the fact that in the Village of Mill Neck case appellant argued that none of the changes imposed any additional regulations or restrictions or different boundaries on respondent’s property, it is to be noted that respondent disagreed with that argument and that the short memorandum decision of the 'Court of Appeals does not make clear whether the changes it considered substantial were or were not related to respondent’s-property. Logic appears to diótate that if the only person adversely affected by a change does not object, others whose rights are not infringed by the change may not do so. (Matter of Smith v. Hartman, 208 Misc. 880, 885; Matter of Suffolk Pines v. Harwood, 14 Misc 2d 826, 828; see, also, Matter of Hall v. Leonard, 260 App. Div. 591 and Church v. Town of Islip, supra, p. 259).” (Emphasis supplied.)
Lastly, as to Justice Pittoni’s decision, plaintiff does not dispute that no additional rights accrued to him by virtue of any work he did after that decision. His case is submitted here on the basis of what took place before it was rendered. Furthermore, since plaintiff is proceeding on the basis that he has a vested legal right to continue, he is not required to abandon it without a contest and apply for a discretionary variance as urged by defendant. Incidentally it appears that such an application would have been quite futile since the apartment house amendments under which his permit was issued, were repealed by the new City Council on February 27, 1968.
*826 Even without the sanction of res judicata, had the trial before Justice Albert been in any sense an adversary proceeding, this court would be inclined to accord it considerably more weight, but in view of the way in which that judgment was obtained and the gross inequity which has been done to this plaintiff by virtue of it, without any hearing of his case on the merits, I deem it more important to accord him Ms day in court.
Judgment is granted to the plaintiffs as prayed for in the complaint, with costs.